UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
DAVID L. BRITT, SR.

                        Plaintiff,           10-CV-6200T

            v.                               **DECISION**
                                             **and ORDER**
MICHAEL ASTRUE,
Commissioner of Social Security

                        Defendant.
_____

## INTRODUCTION

     Plaintiff, David L. Britt, Sr. ("Plaintiff") brings this action pursuant to the Social Security Act, § 216(i) and § 223(d), seeking review of a final decision of the Commissioner of Social Security ("Commissioner").  Specifically, Plaintiff alleges that the decision of the Administrative Law Judge ("ALJ") was not supported by the substantial evidence contained in the record and was contrary to the applicable legal standards.

     The Commissioner moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) ("Rule 12(c)"), on the grounds that the ALJ's decision was supported by substantial evidence.  Plaintiff opposes the Commissioner's motion, and cross-moves for judgment on the pleadings, on grounds that the Commissioner's decision was erroneous and was not supported by the substantial evidence in the record.

     For the reasons set forth below, this Court finds that the

decision of the Commissioner is supported by substantial evidence, and is in accordance with applicable law. Therefore, the Commissioner's motion for judgment on the pleadings is granted and the Plaintiff's motion is denied.

## BACKGROUND

On February 27, 2007, the Plaintiff filed an application for Disability Insurance Benefits under Title II, § 216 (i) and § 223 of the Social Security Act ("the Act") claiming a disability since August 16, 2001, due to low back pain, pain from a bilateral leg injury and diabetes. (Transcript of Administrative Proceeding at pages 91, 100) (hereinafter "Tr."). Plaintiff's application was denied by the Social Security Administration ("the Administration") initially on May 14, 2007. (Tr. at 49, 51). On May 23, 2007, Plaintiff filed a timely request for hearing.

Thereafter, Plaintiff appeared, with counsel, at an administrative hearing before ALJ Michael J. Friedman on September 10, 2009. In a decision dated September 25, 2009, the ALJ determined that the Plaintiff was not disabled. The ALJ's decision became the final decision of the Commissioner when the Social Security Appeals Council denied Plaintiff's request for review on March 19, 2010. On April 8, 2010, Plaintiff filed this action.

## DISCUSSION

### I.   Jurisdiction and Scope of Review

42 U.S.C. § 405 (g) grants jurisdiction to district courts to

hear claims based on the denial of Social Security benefits. Additionally, the section directs that when considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is defined as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 217 (1938). Section 405 (g) thus limits the Court's scope of review to determining whether or not the Commissioner's findings are supported by substantial evidence. See, Monquer v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (finding that a reviewing Court does not try a benefits case de novo). The Court is also authorized to review the legal standards employed by the Commissioner in evaluating Plaintiff's claim.

The Court must "scrutinize the record in its entirety to determine the reasonableness of the decision reached." Lynn v. Schweiker, 565 F. Supp. 265, 267 (S.D. Tex. 1983) (citation omitted). The Commissioner asserts that his decision was reasonable and is supported by the evidence in the record, and moves for judgment on the pleadings pursuant to Rule 12 (c). Judgment on the pleadings may be granted under Rule 12 (c) where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. Sellers v. M.C. Floor Crafters Inc., 842 F.2d 639 (2d Cir. 1988).

If, after a review of the pleadings, the Court is convinced that Plaintiff has not set forth a plausible claim for relief, the judgment on the pleadings may be appropriate. See Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).

## II. There is Substantial Evidence in the Record to Support the Commissioner's Decision that the Plaintiff was not Disabled from August 16, 2001 to December 31, 2004.

In his decision, the ALJ followed the required five-step analysis for evaluating disability claims (Tr. at 18, 20). The five-step analysis requires the ALJ to consider the following:

(1) Whether the claimant is currently engaged in substantial gainful activity;

(2) if not, whether the claimant has a severe impairment which significantly limits her physical or mental ability to do basic work activities;

(3) if the claimant suffers a severe impairment, the ALJ considers whether the claimant has an impairment which is listed in Appendix 1, Subpart P, Regulation No. 4, if so, the claimant is presumed disabled;

(4) if not, the ALJ considers whether the impairment prevents the claimant from doing past relevant work;

(5) if the claimant's impairments prevent her from doing past relevant work, if other work exists in significant numbers in the national economy that accommodate the claimant's residual functional capacity and vocational factors, the claimant is not disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v).

The Plaintiff bears the burden of proof on the first four steps, but the Commissioner bears the burden on the last step, and therefore must demonstrate the existence of jobs in the economy

that the claimant can perform.  See, e.g., Kamerling v. Massanari, 295 F.3d 206, 210 (2d Cir. 2002).  When employing the five-step analysis, the ALJ must consider four factors: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified by the claimant or others; and (4) the claimant's educational background, age, and work experience."  See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Monguer v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

Finally, the ALJ must give special consideration to the findings of a claimant's treating physician.  A treating physician's opinion is controlling if it is "well supported by medical findings and not inconsistent with other substantial record evidence."  See Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); see 20 C.F.R. § 416.927(d)(2).  The more consistent a treating physician's opinion is with other evidence in the record, the more weight it will be accorded.  See § 416.927(d)(4).

Here, the issue is whether the Plaintiff established disability from August 16, 2001 through December 31, 2004, the date last insured.  See § 216(i) and §223(d).  The ALJ found that (1) the Plaintiff did not engage in substantial gainful activity during the relevant time period; (2) the Plaintiff had the following severe impairments: degenerative disc disease and right knee pain; (3) the Plaintiff did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; (4) the Plaintiff was unable to perform any past relevant work; and (5) between August 16, 2001 through the date last insured, the Plaintiff had the residual functional capacity to perform the full range of sedentary work, as defined in 20 C.F.R. § 202.1567(a). The ALJ concluded that, based on the Plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the Plaintiff could perform.   Therefore, the ALJ found that the Plaintiff was not under a disability, as defined in the Social Security Act, from August 16, 2001 through December 31, 2004.

### A.   The Medical Evidence.

On August 15, 2001, the Plaintiff was lifting large, broken pieces of a concrete sidewalk, and throwing them off to the side. (Tr. at 197). The next day, Plaintiff was removing forms out of the ground, frequently bending over to pick them up.   Id.   While lifting a form, the Plaintiff felt a sharp pain in his back and was unable to move due to the pain.   Id.   The Plaintiff stopped working and contacted his physician Dr. Rebecca Wadsworth, M.D.   Dr. Wadsworth diagnosed Plaintiff with lower lumbar strain and sprain, referred him to physical therapy and prescribed hydrocodone.   Id. Plaintiff was also referred to see Dr. Peter N. Capicotto, an orthopedic surgeon.   (Tr. at 207).

Dr. Capicotto examined Plaintiff on October 2, 2001 for complaints of low back and bilateral leg pain. Id. Upon physical examination, Plaintiff had a mild left antalgic gait, but was able to perform heel and toe walk. Id. Deep palpation was tender in the lower lumbar spine and over the base of the sacrum with no sciatic notch tenderness. Id. Plaintiff had excellent strength in the lower extremities and straight leg raising was normal. Id. Plaintiff's sensory examination was intact and reflexes were 2+ and symmetrical throughout the ankle and knee jerks. Id. X-rays of the spine revealed normal disc spaces. Id. Dr. Capicotto recommended Plaintiff undergo an MRI of his lumbrosacral spine to rule out disc herniation. Id.

On November 13, 2001, Dr. Capicotto reported that although Plaintiff complained of back and leg pain, the MRI did not demonstrate any abnormality of his spine and that he had well maintained discs and lordosis (Tr. at 206). Dr. Capicotto advised the Plaintiff that he had little to offer him and did not have an explanation for the pain. Id. Dr. Capicotto advised Plaintiff to see a neurologist. Id. He also advised Plaintiff to avoid repetitive bending and twisting and no lifting greater than 10 to 15 pounds. Id. He advised Plaintiff to drive for intervals of 45 minutes. Id.

On November 29, 2001, upon referral from Dr. Wadsworth, Plaintiff saw Dr. Matthew W. Alexander, D.C., a chiropractor. Dr.

Alexander examined Plaintiff for complaints of sharp and shooting lower back pain. (Tr. at 395). Dr. Alexander's primary goals of care were to eliminate Plaintiff's regional muscle spasm, reduce the regional tenderness and return Plaintiff to normal daily activities without pain. Id. Although symptoms since August 16, 2001 improved somewhat overall, Dr. Alexander found Plaintiff to be temporarily totally disabled. (Tr. at 205). Dr. Alexander reevaluated Plaintiff again on May 9, 2002 and found that muscle spasms in the lower back decreased by approximately 75%, the tenderness in the lower back decreased by approximately 50% and the active rangers of motion in the lower back increased by approximately 50%. (Tr. at 396). Dr. Alexander diagnosed Plaintiff with "lumbrosacral sprain and strain - chronic severe...with associated bilateral radicular symptoms...causing left buttock and thigh pain as well as right anterior knee pain." Id.

In January 2002, a normal lumber myelogram ruled out a herniated disc. (Tr. at 319). There was no evidence for significant thecal sac stenosis and the lower lumber nerve sleeves filled normally. Id. Vertebral bodies were normal in alignment. Id. Similarly, a lumbar spine CT scan revealed low back pain, but no evidence for disc bulge or herniation at T10-11 through L2-3 and L3-4. (Tr. at 322). There is mild facet arthropathy at L4-5 and mild disc bulge at L5-S1. Id.

On March 2002, upon referral from Dr. Wadsworth, Plaintiff was

seen by Dr. Donovan Holder from Pain Treatment Medicine. Dr. Holder examined Plaintiff for complaints of low back pain. (Tr. at 261-63). Dr. Holder's examinations revealed mostly normal full flexion and extension of the lumbar spine. (Tr. at 262). Palpation of the cervical, thoracic and lumbar spine was unremarkable, but there was marked tenderness overlying the left sacroiliac joint and the right was within normal limits. Id. Bilateral straight leg raising was normal as were Plaintiff's sensory and neurologic examinations. Id. Reflexes were equal bilaterally. Id. Dr. Holder diagnosed radicular left low back pain, left sacroiliitis, and ruled out left lumbar facet arthropathy. Id. He recommended Plaintiff undergo a series of epidural steroid blocks. Id. Dr. Holder indicated on January 28, 2002, however, that the epidural steroid blocks did not show significant improvement in Plaintiff's symptoms (Tr. at 355, 401).

In July 2002, Plaintiff saw Dr. Michael A. Colucci, an orthopedic surgeon, for complaints of right knee pain. (Tr. at 288-89). Upon physical examination, Plaintiff's right knee showed no effusion and no tenderness along the medial joint line. The calves were soft and there were no neurovascular deficits. Id. Straight leg raise test was negative. Id. An x-ray of the right knee revealed a small osteophyte consistent with very slight degenerative change. Id. Dr. Colucci opined that the Plaintiff "may work with restrictions: no kneeling, climbing or squatting."

Id.

Dr. Colucci's findings during a follow up exam two months later were essentially unchanged. (Tr. at 290). Dr. Colucci opined that Plaintiff could work with the same restrictions and suggested that Plaintiff do home exercises and strengthening. Id. Due to the Plaintiffs symptoms in October 2002, Dr. Colucci recommended an MRI of the right knee. (Tr. at 291). The MRI revealed bone bruises of the medial tibial plateau and slight fluid within the proximal patellar tendon, consistent with tendinitis. Dr. Colucci suggested considering diagnostic arthroscopy or steroid injections, if Plaintiff's symptoms were exacerbated (Tr. at 292). In March 2003, Dr. Colucci opined that Plaintiff could work without restrictions. Dr. Colucci agreed to follow up on Plaintiff's symptoms on an as need basis. (Tr. at 292-95).

In June 2003, Dr. Capicotto continued to treat Plaintiff for back pain due to increasing complaints of left buttock and posterior thigh pain. (Tr. at 188). During exam, Plaintiff was able to flex and extend with moderate loss. Id. Hip and knee range of motion was normal with increased complaints of pain. Id. The L5-S1 was tender with palpation, but sensation was intact. Id. Sitting straight leg raise testing was negative and in the supine position, Plaintiff had hamstring tenderness. Id. Dr. Capicotto suggested that Plaintiff undergo a second MRI of his lumbar spine to rule out any neural compression. Id.

On July 11, 2003, Dr. Eugene J. Coyle, an orthopedic surgeon, examined Plaintiff for complaints of lumbroscral pain radiating to the left buttocks.  (Tr. at 177-81).  Plaintiff reported that the epidural injections had not helped his back pain.  Id.  On examination, cervical spine motion was normal.  Id.  Reflexes of the upper extremities were equal bilaterally.  Id.  Plaintiff had full extension of both hips while recumbent and quadricep muscles were normal.  Id.  Neither knee had effusion and the ligaments were all normal.  Id.  The nerves of the lower extremities had normal femoral distribution.  Id.  Plaintiff reported "extreme pain" on straight leg raising on both sides.  Id.  Dr. Coyle opined that Plaintiff should not lift more than 10-15 pounds, should not bend, turn or twist his spine, and should avoid sitting for more than 35-40 minutes. Id.

On September 12, 2003, Dr. Capicotto, along with his associate, Liz Renner, examined the Plaintiff and the results of the second MRI.  Plaintiff continued to have identical systems. (Tr. at 269).  Id.  Dr. Capicotto however reviewed Plaintiff's new MRI and confirmed it to be absolutely negative.  Id.  At that point, Dr. Capicotto had "little else to offer . . . since there is no surgical intervention that [Dr. Capicotto] could entertain," he did not plan on any further followup.  Dr. Capicotto further noted that "with continued back pain and yet negative MRI, [Plaintiff] is moderately restricted."  Id.

On September 26, 2003, Dr. Colucci again examined Plaintiff to follow up for his right knee pain. (Tr. at 295). Id. Dr. Colucci noted exacerbation right knee pain with evidence of patellofemoral chondrosis. Id. Treatment options were discussed. Id. Dr. Colucci requested for right knee arthroscopy and possible patellofemoral chondroplasty. Id. Surgery was scheduled for the near future pending authorization. Id.

On December 29, 2003, while awaiting clearance for arthroscopic surgery on the right knee, Plaintiff saw Dr. Coyle who noted that Plaintiff could flex forward to 70 degrees with pain radiating into the left lower extremity. (Tr. at 175). Dr. Coyle noted that there was no evidence of any hyper lordosis, no scoliosis, and no evidence of kyphosis. Id. Percussion of the lumbrosacral area caused severe pain radiating into the left lower extremity. Id. Dr. Coyle opined that Plaintiff should not lift greater than 20-25 pounds and should avoid repetitive bending, twisting and turning activities. Id.

A right knee arthroscopy surgery was performed by Dr. Colucci on March 17, 2004, without complications. (Tr. at 298-99). Nine days following surgery, Plaintiff was scheduled to undergo physical therapy. Dr. Colucci opined that Plaintiff was temporarily totally disabled. Id. On April 23, 2004, 5 weeks after right knee arthroscopy, Dr. Colucci examined the Plaintiff and again determined that Plaintiff remained temporarily totally disabled.

(Tr. at 300).

However, on June 11, 2004, 3 months after right knee arthroscopy, Dr. Colucci examined the Plaintiff and determined that Plaintiff was "making slow functional recovery after the surgery and [Plaintiff] will progress to a home exercise program for additional motion and strength recovery." Dr. Colucci also stated that Plaintiff could work with the following restrictions: no kneeling, climbing, or squatting. (Tr. at 301). On June 10, 2004, Plaintiff was also discharged from physical therapy after 11 sessions as he was "close to achievement of his long term [physical therapy] goals." (Tr. at 209).

Dr. Alexander saw Plaintiff for reports of low back pain on June 21, 2004 and stated that he would continue with the same treatment program. (Tr. at 397). Dr. Alexander reported that the Plaintiff's chronic lower back injury has severely impacted his quality of life. Id. The physiotherapy treatment used consisted of moist heat for 20 minutes and high volt EMS for 20 minutes. Id. Manipulation consisted of Cox flexion distraction to the lumber spine. Id. Additionally, diversified maneuvers were applied to the lumbar spine and the thoracic spine. Id. The treatment was tolerated well and afterward, Plaintiff reported feeling better but still had some lower back pain. Id. Dr. Alexander reported that all other conservative measures have been explored and failed including ESI, work hardening and rehab exercises. (Tr. at 398).

On June 23, 2004, Plaintiff again saw Dr. Capicotto with reports of pain in his low back. (Tr. at 185). Although Plaintiff noted increased pain with walking or standing, it was mainly in the left lumbrosacral region. Id. He was taking Bextra for his right knee pain at the time, however, he was not taking any medications for his low back pain and denied incontinence or significant weakness in the lower extremities. Id. Dr. Capicotto's opinion regarding plaintiff's physical abilities remained unchanged, but he ordered another MRI of the lumbar spine. (Tr. at 184).

Dr. Ronald Horvath, M.D., an orthopedic surgeon, examined Plaintiff in August 2004. (Tr. at 171-73). Dr. Horvath reviewed the records from Dr. Capicotto, Dr. Alexander, and Dr. Colucci, and opined that treatment appeared to be reasonable and necessary. Id. Plaintiff complained of persistent back pain with radiation to the left buttock as well as right knee pain and swelling. Dr. Horvath noted that a 2001 lumbar MRI was normal and 2002 EMG and nerve conduction studies revealed mild left S-1 radiculopathy. On physical examination, Plaintiff had painless full range of motion of the cervical spine and shoulders. Id. Deep tendon reflexes were active and equal to the upper extremities with no evidence of muscle weakness or sensory deficit. Id. The thoracic spine was nontender. Id. He had lower lumber tenderness with left paravertebral muscle spasm. Straight leg raising was negative bilaterally and deep tendon reflexes were active and equal. Id.

The knees had full extension and the left knee had full painless range of motion while the right knee revealed well healed arthroscopic scars. The right knee's range of motion was 0-135 degrees. <u>Id.</u> Neither knee had instability. <u>Id.</u> Dr. Horvath concluded that Plaintiff had lumber strain superimposed upon degenerative disc disease of the lumbar spine, and post-op arthroscopic chondroplasty of the medial femoral condyle and partial lateral meniscectomy. <u>Id.</u> Dr Horvath restricted Plaintiff from lifting more than 10 pounds on occasion and five pounds frequently as well as no prolonged walking, standing or bending. Dr. Horvath also recommended that Plaintiff should not be required to squat. <u>Id.</u>

In October 2004, Dr. Capicotto examined Plaintiff and again noted that his MRI was normal and that Plaintiff has had normal studies of his back on multiple occasions. (Tr. at 265). Dr. Capicotto opined "at this stage, I see little that I could help him with. I do not know the origin of his complaints . . . I am not planning to see him back since there is no operative lesion." <u>Id.</u>

   B.   <u>**The ALJ's decision at Step 2 and Step 3 is supported by substantial medical evidence in the record**</u>

At Step 2, the ALJ found that, from August 16, 2001 to December 31, 2004, the Plaintiff had the following severe impairments: degenerative disc disease and right knee pain. (Tr. at 20). The Plaintiff argues that the ALJ erred when he determined

that his obesity, left knee patellofemoral degenerative disease with evidence of a subchondral contusion, and arthritis were not severe impairments. Plaintiff also argues that there is substantial evidence showing that his left knee impairment caused more than minimal functional limitations.

Dr. Colucci examined Plaintiff on July 29, 2002 for complaints of right knee pain for nearly one year. At that time, Plaintiff's right knee showed no effusion and no tenderness along the medial joint line. Two months later, Plaintiff's right knee conditions were unchanged. Dr. Colucci however performed right knee arthroscopy on March 17, 2004. During his initial examination, there was no mention of complaints of left knee pain. Similarly, Dr. Horvath also examined Plaintiff due to right knee pain and swelling. Although there were only complaints of right knee pain, Dr. Horvath examined both knees. The right knee revealed well healed arthroscopic scars and the left knee had full painless range of motion. During the requisite time period, August 6, 2001 through December 31, 2004, there is no medical evidence to support that Plaintiff suffered from left knee patellofemoral degenerative disease.

Further, there is no medical evidence in the record within the applicable time period regarding Plaintiff's obesity or arthritis that supports Plaintiff's contention that these conditions limited his ability to work. Accordingly, this Court finds that the ALJ

properly concluded the Plaintiff's obesity and arthritis to be a non-severe impairments.

At Step 3, the ALJ found that, through the date last insured, the Plaintiff did not have an impairment or combination of impairments that met or medically equaled a Listing in 20 C.F.R. Part 404, Appendix 1, Subpart P.  The ALJ provided a detailed discussion of the evidence in Step 5 of his opinion.  In Step 5 of his decision, the ALJ found that, through the date last insured, the Plaintiff had the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a). The ALJ proceeded to support his finding with substantial evidence in the medical record showing that the Plaintiff failed to establish that his conditions met or medically equaled the criteria listed in § 1.02 and § 1.04.  Equivalence is to be determined by "all evidence in [the Plaintiff's] case record about [the Plaintiff's] impairment(s) and its effects on [the Plaintiff] that is relevant to this finding."  20 C.F.R. § 404.1526.

For a claimant to meet or equal the severity of Listing 1.02, the claimant must suffer from:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
>
> A. Involvement of one major peripheral weight-bearing joint

(i.e., hip, knee, or ankle), resulting in instability to ambulate effectively, as defined in 1.00B2b; or

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in ability to perform fine and gross movements effectively as defined in 1.00B2c.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.02.

For a claimant to meet or equal the severity of Listing 1.04, the claimant must suffer from:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04.

The Plaintiff argues that the ALJ erred by not providing a rationale for his decision to conclude that an impairment or

combination of impairments did not meet or medically equal a Listing in Appendix 1, Subpart P, and Regulations No. 4, including § 1.02 and § 1.04.  I find that the ALJ properly supported his decision that Plaintiff's knee pain and lower back pain did not meeting a Listing 1.02 and 1.04, respectively.

Dr. Colucci found that the Plaintiff's right knee showed no effusion and no tenderness along the medial joint line.  Although an x-ray of the right knee revealed a small osteophyte, it was only consistent with very slight degenerative change.  In that instance, Dr. Colucci opined that Plaintiff may work with restrictions. Although a 2002 MRI revealed bone bruises of the medial tibial plateau and slight fluid within the proximal patellar tendon, the Plaintiff reported to Dr. Coyle in 2003 that the recommended epidural steroid injections did not help the Plaintiff's pain.

In 2004, Plaintiff underwent right knee arthroscopy surgery performed by Dr. Colucci.  Just three months later, a follow-up exam revealed that Plaintiff was able to work with restrictions: no kneeling, climbing, or squatting.  Also, on June 10, 2004, Plaintiff was discharged from physical therapy after 11 sessions as he was "close to achievement of his long term [physical therapy] goals."

The ALJ also properly analyzed Plaintiff's symptoms of pain. A CT scan performed in January 2002 revealed no evidence of a disc herniation, mild facet arthroscopy and mild disc bulge at LR4-5 and

L5-S1.  Dr. Holder's Pain Treatment Medicine in March 2002 also revealed mostly normal full flexion and extension of the lumbar spine.  Accordingly, I find that the ALJ properly concluded that Plaintiff did not satisfy the factors of Listing 1.02.

Regarding Plaintiff's lower back pain, the ALJ's decision is supported by the medical evidence.  A 2001 MRI of Plaintiff lumbrosacral spine ruled out disc herniation.  In addition, Dr. Capicotto stated that the MRI did not demonstrate any abnormality of his spine and that he had well maintained discs and lordosis.  That same year, Dr. Holder's examinations revealed mostly normal full flexion and extension of the lumbar spine.  Dr. Coyle found upon examination, that Plaintiff's cervical spine motion was normal and that reflexes of the upper extremities were equal bilaterally.  Dr. Horvath stated that during physical examination, Plaintiff had painless full range of motion of the cervical spine.  Accordingly, I find that the ALJ properly concluded that Plaintiff did not satisfy the factors of Listing 1.02.

The Plaintiff further argues that there is substantial evidence that Plaintiff was incapable of ambulating effectively. To satisfy both Listing 1.02 and 1.04, the Plaintiff must be able to show that his impairment results in an inability to ambulate effectively.  The Plaintiff in this case, however, reported in his application for disability that he takes care of his children while his wife is working, prepares some meals, drives to his

appointments up to three times per week, drives to see his mother twice a week, drives to church once a month, grocery shops for food and clothes twice a month for up to two hours at a time with the assistance of an electric cart, pays bills, participates in hobbies on a limited basis, lifts up to 25 pounds, stands up to 45 minutes at a time, and walks and sits up to 30 minutes at a time.  (Tr. at 145-52).  This Court finds that there is substantial evidence in the record to support that Plaintiff able to ambulate effectively within the requisite time period.

Plaintiff also argues that the ALJ failed to consider Listing 1.03.  For a claimant to meet or equal the severity of Listing 1.03, the claimant must undergo reconstructive surgery or surgical arthrodesis of a major weight bearing joint, with inability to ambulate effectively, as defined in § 1.00(B)(2)(b), and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.  In applying the same medical evidence and reasons above, there is substantial evidence to support that the Plaintiff was able to ambulate effectively.  Thus, this Court finds that the ALJ properly concluded that the Plaintiff's impairments did not meet or medically equal Listing 1.02, 1.03 and 1.04.

C. **The ALJ gave proper weight to the opinions of Plaintiff's treating physicians when assessing Plaintiff's residual functional capacity**

The ALJ found that the Plaintiff must establish disability on

or before December 31, 2004, the date last insured, in order to be entitled to a period of disability and disability benefits. (Tr. at 18). The ALJ concluded that the Plaintiff was not disabled within the meaning of the Social Security Act from August 16, 2001 through the date last insured. <u>Id.</u> In his decision, the ALJ gave substantial weight to the opinions of physicians Drs. Capicotto, Colucci and Coyle, because their opinions were consistent and supported by the medical evidence in the record. (Tr. at 23). The ALJ concluded that "the residual functional capacity assessment is supported by the objective medical evidence because the objective medical records, especially those of the lumber spine, showed no abnormalities . . . and each consultant stated that the claimant should be able to perform light work in spite of his back and knee impairments. There is no basis in the credible record to find that he is unable to perform a full range of sedentary work from an exertional standpoint." <u>Id.</u>

To determine the weight given to a physician's medical opinion, the ALJ must consider the following factors: (1) whether there was a treatment relationship; (2) the length, frequency, nature , and extent of the treatment relationship; (3) whether the relationship is supported by medical and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) whether the physician is specialized; and (6) any other relevant factors. <u>See</u> 20 C.F.R. § 416.927 (d)(3)-(6), § 416.1527(d)(3)-(6).

Generally, if a treating physician's opinion is well-supported by medical evidence and is not inconsistent with other substantial evidence in the record, it is given controlling weight. 20 C.F.R. §416.927(d)(2), §416.1527 (d)(2).

The Plaintiff here argues that the ALJ erroneously failed to give controlling weight to treating physician Dr. Rebecca Wadsworth. Plaintiff also argues that the ALJ did not give any weight to Drs. Matthew Alexander, Frederick Kaemppfe, and Ronald Horvath, all of whom treated Plaintiff for his back and knee injuries.

In considering evidence submitted to show Plaintiff's condition from August 16, 2001 to December 31, 2004, the ALJ considered the reports of treating physician, Dr. Rebecca Wadsworth. (Tr. at 21). In 2001, Dr. Wadsworth examined Plaintiff shortly after the date of his injury and diagnosed him with lower lumbar strain and sprain and prescribed him hydrocodone. Dr. Wadsworth referred Plaintiff to Dr. Alexander, a chiropractor, and various orthopedic specialists. While Dr. Wadsworth opined in 2009 that Plaintiff was unable to engage in work-related activities (Tr. at 465-67), this opinion was rendered nearly five years after the expiration of Plaintiff's date last insured in December 2004. There is insufficient medical evidence from the requisite time period to support Dr. Wadsworth's 2009 opinion.

While Dr. Alexander, in January 2002, opined that Plaintiff

was temporarily totally disabled "until further notice"(Tr. at 205), he noted in 2004 that he would continue with the same treatment program and that all other conservative measures had been explored and failed. Dr. Alexander's opinion however, as a chiropractor, is not entitled to the same weight as that of a treating physician. Evidence from Dr. Alexander will be considered as additional evidence from "other medical sources." 20 C.F.R. 404.1513(d) and 416.913(d). Although factors in 20 C.F.R. §416.927(d)(2), §416.1527 (d)(2) explicitly apply only to the evaluation of medical opinion from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." See SSR 06-03p. In consideration of the medical relationship between Dr. Alexander and Plaintiff and also the fact that Dr. Alexander's opinion was not consistent with the record as a whole, this Court finds the ALJ properly gave no weight to Dr. Alexander.

The ALJ also properly weighed Dr. Horvath's opinion. Dr. Horvath reviewed the records of Drs. Capicotto, Alexander and Colucci and found that treatment appeared to be reasonable and necessary. Furthermore, Dr. Horvath's records were not inconsistent with the treating physicians nor consulting physicians.

Regarding the records of Dr. Kaemppfe, while his opinion was referenced throughout the record by other physicians, the record

does not contain any evidence of actual treatment until 2006, after the requisite time period.  The Plaintiff argues that the ALJ did not assess Dr. Kaemppfe's treatment for bilateral knee pain in 2006.   The 2006 treatment, however, revealed "left knee pain resolving" and Dr. Kaempffe agreed to make followup appointments on an as needed basis.    Thus, there is insufficient medical evidence from the requisite time period to support Dr. Kaemppfe's opinion. This Court finds that the ALJ properly evaluated the length, nature, frequency and extent of the treatment relationship between Plaintiff and Drs. Capicotto, Colucci and Coyle, and that the ALJ properly evaluated the weight of the treating physicians.  See 20 C.F.R. §416.927 (d), §416.1527(d); SSR 06-03p.

The Plaintiff argues that the ALJ erroneously relied on the opinion of a single decision maker state agency disability examiner, K. Jones' opinion.  (Tr. at 22-23).  However, the ALJ stated that the Plaintiff was slightly more limited than that the State Agency analyst found him to be.   (Tr. at 23).   Jones concluded "that the claimant could occasionally lift and carry up to 20 pounds, frequently lift and carry less than 10 pounds, stand and talk at least 6 hours of an 8 hour day, sit for 6 hours of an 8 hour day, and had an unlimited ability to push and pull."  Id. In this instance, the ALJ found that the Plaintiff had a residual functional capacity to do sedentary work.   Id.  The ALJ did not only rely on the opinion of the State Agency analyst, but also the

objective medical evidence, the claimant's testimony with regard to his level of daily activities, and the treating physician's statements that the claimants should be able to perform light work in spite of his back and knee impairments. Id. Accordingly, this Court finds that the ALJ did not erroneously rely on the opinion of the state agency disability examiner.

**D.** **ALJ properly concluded that Plaintiff's testimony was not entirely credible.**

The ALJ found that, considering the factors contained in 20 C.F.R. 404.1529 and SSR 96-7p, the Plaintiff's reports of disabling levels of pain are inconsistent with other evidence within the record, including the clinical evidence and the Plaintiff's own statements. The Plaintiff argues that the ALJ did not apply the appropriate legal standards in assessing Plaintiff's credibility.

During the hearing, Plaintiff testified that he can only sit, stand, and walk for about one half hour. (Tr. at 35). Evidence that Plaintiff is capable of engaging in varied activities despite allegations of severe pain is supportive of a conclusion that Plaintiff's alleged pain is not disabling. See Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980). Here, Plaintiff reported in his application for disability that he takes care of his children while his wife is working, prepares some meals, drives to his appointments up to three times per week, drives to see his mother twice a week, drives to church once a month, grocery shops for food and clothes twice a month for up to two hours at a time with the

assistance of an electric cart, pays bills, participates in hobbies on a limited basis, lifts up to 25 pounds, stands up to 45 minutes at a time and walks and sits up to 30 minutes at a time. (Tr. at 145-52).   The ALJ also found that an April 3, 2007 Worker's Compensation Report noted that the Plaintiff related that the chiropractic and physical therapy resulted in improvement of his condition.  (Tr. at 22, also see Tr at 188, 201).

The ALJ properly evaluated Plaintiff's credibility and concluded that his testimony was not entirely credible.  Plaintiff was able to perform a range of daily activities, and the medical evidence supports the decision that the Plaintiff is able to perform at least sedentary work.  Based on the medical evidence in the record and the Plaintiff's testimony, this Court finds that there is substantial evidence in the record to conclude that the Plaintiff was not disabled within the meaning of the Social Security Act from August 16, 2001 to December 31, 2004, the date last insured.

## CONCLUSION

For the reasons set forth above, this Court finds that the Commissioner's decision to deny the Plaintiff benefits was supported by substantial evidence in the record.   Therefore, I grant the Commissioner's motion for judgment on the pleadings.  The Plaintiff's complaint is dismissed with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

s/Michael A. Telesca
MICHAEL A. TELESCA
United States District Judge

Dated: April 25, 2011
       Rochester, New York